PEOPLE v ROBINSON

Docket No. 49922. Submitted April 22, 1981, at Detroit.—Decided June 30, 1981.

McClinton Robinson was convicted of second-degree murder, Recorder's Court of Detroit, Leonard Townsend, J. The victim was wounded by a shotgun blast to her arm, which later was amputated. She died 39 days after the shooting. Defendant alleges on appeal that the trial court erred by precluding the defendant's expert medical witness from rendering his opinion that the failure to promptly amputate the victim's arm was "grossly erroneous" or "grossly unskillful" and resulted in the victim's death. *Held:*

Whether or not the victim received "grossly erroneous" medical treatment, which might exculpate the defendant from guilt of the homicide, was an ultimate issue of fact. An expert witness may testify to ultimate issues of fact if the testimony is otherwise admissible. In this case the defendant failed to demonstrate that the expert witness was qualified by having knowledge of the standard of care required of surgeons. The trial court properly could have excluded the witness's opinion on the degree of alleged malpractice. Therefore, exclusion of the witness's opinion on the issue of "grossly erroneous" treatment was not error requiring reversal.

Affirmed.

1. HOMICIDE — MEDICAL TREATMENT — CRIMINAL LAW.

"Grossly erroneous" medical treatment received by a crime victim which results in death breaks the causal connection of an accused's act and may exculpate the accused from guilt in the

REFERENCES FOR POINTS IN HEADNOTES

[1] 40 Am Jur 2d, Homicide § 19.
   Homicide predicated on improper treatment of disease or injury. 45 ALR3d 114.
[2] 31 Am Jur 2d, Expert and Opinion Evidence § 22.
[3, 4] 31 Am Jur 2d, Expert and Opinion Evidence §§ 30, 31.
   Necessity and sufficiency of showing of medical witness' familiarity with particular medical or surgical technique involved in suit. 46 ALR3d 275.

crime of homicide where the wound was not fatal and the victim may have recovered; mere "negligent" medical treatment, however, is a foreseeable event and will not suffice to exonerate the accused.

2. Witnesses — Expert Witnesses — Ultimate Issue of Fact — Rules of Evidence.

The opinion of an expert witness may embrace an ultimate issue of fact if the expert's opinion testimony is otherwise admissible into evidence; that is, it must be determined that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue and must not tend to mislead or confuse the jury (MRE 702, 703, 704).

3. Witnesses — Expert Witnesses — Medical Malpractice.

A medical specialist may testify as an expert witness concerning malpractice in an area other than his specialty, but the party proffering the expert must show that he has knowledge of the standard of care about which he is to testify.

4. Witnesses — Expert Witnesses.

The question of whether an expert witness is properly qualified is a matter within the discretion of the trial court.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Janice M. Joyce,* Assistant Prosecuting Attorney, for the people.

*Gerald M. Lorence,* for defendant on appeal.

Before: N. J. Kaufman, P.J., and Allen and D. C. Riley, JJ.

Per Curiam. Defendant was convicted by jury of murder in the second degree, MCL 750.317; MSA 28.549. He was sentenced to 10 to 20 years imprisonment to run concurrently with a sentence of 20 to 30 months for a probation violation. This Court granted defendant's application for delayed appeal.

On November 5, 1978, Geneva Williams suffered

a wound from a shotgun blast to her left arm; her arm subsequently required amputation. Thirty-nine days after she was wounded, the victim died. According to the medical examiner, death was due to a shotgun wound of the left arm, complicated by sepsis and pneumonia. Defendant was charged with murder in connection with the death of Geneva Williams.

In addition to the testimony of witnesses, who were present in the area at the time of the shooting, the people introduced a statement made by defendant to the police in which he admitted that he was holding a shotgun at the time it discharged, striking Geneva Williams in the arm. However, defendant stated that the gun had accidentally fired when he turned to ascend a flight of stairs and the gun hit the bannister.

Defendant offered the testimony of Robert Sillery, an expert in pathology, and, at the time, chief medical examiner for Oakland County. Dr. Sillery testified that he was capable of rendering an opinion as to the cause of death based upon an examination of medical records of a deceased without having actually examined the deceased. He stated that he examined the records of Geneva Williams and that in his opinion the cause of death was septicemia and bronchial pneumonia. He testified that because of the nature of the wound, unless surgical removal of the areas of contamination occurred within 48 hours, blood poisoning would set in. Defense counsel asked Dr. Sillery if he had a medical opinion as to whether the victim's arm should have been amputated immediately. Over the prosecutor's objection, the trial court allowed the doctor to state that the arm should have been amputated immediately. The doctor was also allowed to testify that, in his opinion, had the arm been removed immediately

the victim would be alive today. Defense counsel attempted on a number of occasions to ask Dr. Sillery if in his opinion the attending surgeons acted in a grossly unskillful or negligent manner. The trial court ruled:

"The doctor can testify to his conclusions. He already made a conclusion. But as to what the degree of negligence was would not be drawn by the doctor."

The general rule upon which defendant based his theory is that where a wound is not fatal, and the victim may have recovered, *"grossly erroneous"* medical treatment received by the victim resulting in death breaks the causal connection of an accused's act and may exculpate him from guilt in the crime of homicide. See *People v Flenon,* 42 Mich App 457, 460-462; 202 NW2d 471 (1972), *lv den* 388 Mich 801 (1972), and cases cited therein. Mere "negligent" medical treatment is a foreseeable event, and will not suffice. Defense counsel was attempting to elicit an opinion from Dr. Sillery that the failure of the attending surgeons to promptly amputate the victim's arm in the present case was "grossly erroneous".

The question presented is whether, in light of MRE 704, which allows otherwise admissible expert opinion to embrace an ultimate issue of fact, the trial court improperly precluded Dr. Sillery from rendering his opinion that the attending surgeons' failure to promptly amputate the victim's arm was "grossly erroneous" or "grossly unskillful".

We are obviously dealing with an "ultimate issue". But that is not the end of our inquiry. The opinion of the doctor must be otherwise admissible. Particularly, the court must determine that the opinion "will assist the trier of fact to under-

stand the evidence or to determine a fact in issue", MRE 702, and the opinion must not tend to mislead or confuse the jury. MRE 703. Generally, those jurisdictions which allow an expert to testify on an ultimate issue nevertheless preclude an opinion in the form of a legal conclusion. McCormick, Evidence (2d ed), § 12, pp 28-29.

This Court recently addressed the issue in terms of whether an expert could render his opinion that a defendant was or was not "mentally ill" or "insane" at the time of the alleged offense. In *People v Drossart,* 99 Mich App 66, 82; 297 NW2d 863 (1980), the Court stated that such testimony did not invade "the provinces of the judge and jury". As stated by McCormick, *supra,* "invasion of the province of the jury" (or judge) is little more than rhetoric, and the real fears are that the jury will subordinate its own analysis to the opinion of the expert, or, as stated by Judge ALLEN in *Drossart,* the legal standard of the expert may be incorrect, incorrectly understood by the jury, or conflict with the trial court's instruction. *Drossart,* pp 76-77. The *Drossart* opinion goes on to state that the latter dangers would not be present "if, in expressing his ideas and opinions on the matter, the witness refers to legal standards properly explained by the trial court or examining attorney". *Drossart,* p 77.

The following statements in *Drossart* are pertinent to the issue presented in the present case:

"Accordingly, a witness is not permitted to tell the jury how to decide the case. Thus, a witness is prohibited from opining on the issue of a party's negligence or nonnegligence, capacity or noncapacity to execute a will or deed, simple versus gross negligence, the criminal responsibility of an accused, or his guilt or innocence. * * *

"* * * However, where the expert's particular training and experience in a special field of activity—such as the study of mental diseases—is largely unfamiliar to the jury, his opinion can be submitted for the jury's consideration." *Drossart,* 79-80. (Citations omitted.)

Thus, according to this Court's decision in *Drossart,* it would appear that while a psychiatrist may testify that in his opinion a defendant was "insane" at the time of an alleged offense, an expert may not opine on the degree of negligence in a medical malpractice case where a jury is as capable as anyone else of reaching such a conclusion on certain facts.

At issue in the instant case was the soundness of the surgeons' decision to amputate or not to amputate the victim's arm. Obviously, the training and experience necessary to make such a decision would be as unfamiliar to a jury as the training and experience required in the study of mental diseases. We believe the jury would have been assisted by an opinion of whether a decision to amputate was a "close call", or whether the decision required little contemplation under accepted medical standards, and thus, a decision not to amputate was a wanton disregard of those standards, or "grossly erroneous". As stated in *Drossart,* the jury would be free to reject this opinion, and the trial court so instructed them.

*Drossart* states that an expert may refer to "legal standards *properly explained by the trial court or examining attorney"*. 99 Mich App 66, 77 (emphasis supplied). Therefore, under *Drossart* it might have been proper in the present case for defense counsel to frame the question to Dr. Sillery as whether the decision not to amputate was made in a "reckless manner" or with "wanton disregard of the safety of the patient".

In any event, we find that Dr. Sillery's opinion on whether the surgeons had acted in a "grossly unskillful" manner was properly excluded on other grounds. While it appears that a medical specialist may testify concerning the malpractice in an area other than his specialty, *Banks v Wittenberg,* 82 Mich App 274; 266 NW2d 788 (1978), *lv den* 403 Mich 809 (1978), it is clear that the party proffering the expert witness must show that the expert has knowledge of the standard of care about which he is to testify. *Callahan v William Beaumont Hospital,* 400 Mich 177; 254 NW2d 31 (1977). In the present case, Dr. Sillery admitted that he was not qualified as a surgeon. Dr. Sillery admitted that he never examined the arm of the victim, but based his opinion on the medical records. Whether an expert is properly qualified is a matter within the trial court's discretion, *Siirila v Barrios,* 398 Mich 576; 248 NW2d 171 (1976), and we are of the opinion that because of defendant's failure to demonstrate that Dr. Sillery had knowledge of the standard of practice for surgeons the trial court could have properly excluded his opinion of the degree of alleged malpractice on this basis.

Thus, though the expert's opinion on the issue of "grossly erroneous" or "grossly unskillful" medical treatment might have been admissible under MRE 704, its exclusion cannot be considered reversible error.

The remaining issues raised on this appeal are without merit and warrant no discussion.

Affirmed.